Argued June 2; affirmed July 13, 1937

# DALK *v.* LACHMUND ET AL.

(70 P. (2d) 558)

George L. Belt and John H. Carson, both of Salem (Carson & Carson, of Salem, on the brief), for appellants.

Emmons & Emmons, of Salem, for respondent.

ROSSMAN, J. The defendants (appellants) present only two assignments of error. The first is based upon a contention that the trial judge erred when he denied the defendants' motion for a mistrial, based upon the development which we shall shortly mention. The second challenges a ruling which denied the defendants' motion for a directed verdict.

The plaintiff and his three assignors operated prune orchards in the vicinity of Salem. A few miles from that city the defendants operated a prune dryer to which the plaintiffs delivered prunes between August 12, 1934, and August 17 of the same year. On the latter day the dryer and the prunes delivered to it by the plaintiff and his assignors were destroyed by fire.

The dryer was a structure 96 by 112 feet in its ground floor dimensions and two stories high. It was divided by a fire wall and corridor into two units, east and west. Although the entire structure was de-

stroyed by fire, this case is concerned with the west section only, of which we shall now give a description. The first story had walls eight inches thick made of hollow tile and was divided into three spaces, each nine by thirteen feet in size, by two other walls made of four-inch hollow tile. The witnesses called these rooms heat chambers. Over each of the three heat chambers were four long rooms, four feet wide, called tunnels. In them prunes were dried by heat created by stoves in the heat chambers. The tile walls of each heat chamber were built up to the lower part of the floor of the tunnels. The front or exterior wall of the heat chamber was thirteen feet high and the rear wall ten feet high. Near the center of the heat chamber, on a concrete slab, stood a cast iron stove, six feet long, three feet wide and three feet high. It burned cordwood. The front of the stove was flush with the front of the building and was fired from outside of the structure. These stoves furnished the dryer's heat. The ceiling of the heat chamber sloped upward from the rear, thereby causing the heat to flow to the front along the inclined ceiling. The latter did not come flush against the front wall, but left an opening called a throat. Its purpose was to permit the heat created by the stoves to pass to the tunnels above. The heat's movement was facilitated by a power-driven fan in the throat which sucked the heated air out of the chambers and blew it in hot blasts against the trays of prunes in the tunnels. The ceiling was constructed principally of wood, two inches thick. On the lower side of the wood was a sheet of asbestos about one-eighth inch thick and on the outside of the latter was a sheet of 16-gauge sheet metal. As already indicated, directly over each heat chamber were four drying tunnels. Thus, in the west unit there were three heat chambers, twelve tunnels

and twelve fans. Each fan was fastened to a long shaft extending the length of the building and was revolved 500 times per minute by a gasoline motor. The tunnels were approximately four feet wide and high enough to accommodate fifteen trays of prunes placed on top of each other. Their floor was not level, but rose two inches to the foot; that is, the rear where the trays of green prunes were admitted was higher than the front from which the dried prunes were removed. They were constructed of tongue and groove flooring, two inches thick. The joists, exterior, roof, etc., of the building were built of wood. According to the only witness who testified upon the subject—he being one who had had extensive experience with prune dryers—the temperature in the heat chambers of prune dryers is kept at 200 degrees and supplies the tunnels with 180 degrees of heat.

The first assignment of error is predicated upon a ruling made by the trial judge while the plaintiff was being examined by his attorney. We now quote:

"Q. After your prunes were destroyed by this fire, and the other property, did you ever call on any of the defendants and make any demand for a settlement of your damages? A. I did.

"Mr. Carson: Objected to as irrelevant, incompetent and immaterial.

"The Court: That isn't necessary in this case.

Here followed some colloquy between the presiding judge and the attorney for the plaintiff. The examination then continued:

"Q. (By Mr. Clarence Emmons) Did you at any time after this fire have any conversation with Mr. Lachmund in regard to this fire? A. I did.

"Q. Where did that take place? A. At Mr. Lachmund's office.

"Q. Do you remember about when it was? A. It was in September of 1934 when I first called on him.

"Q. Will you state what was said at that time?

"Mr. Carson: Pardon me, that has to do particularly with the issues involved in this case?

"Mr. O. W. Emmons: It does.

"Q. (By Mr. Clarence Emmons) I will ask you, Mr. Dalk, to state what conversation took place in regard to the loss of your property? A. I went in to see Mr. Lachmund and asked him if he wouldn't consider our loss and at first he got quite rough, and later—

"Mr. Carson: Pardon me, that is turning him loose—

"The Court: Just state what was said is all, it doesn't make any difference—it's what was said.

A. Mr. Lachmund said, 'We don't dispute your amount, we feel obligated toward you, and I will take the matter up with Mrs. Carson and Mrs. Pincus and Mr. McNary and I will let you know in a few days.' So I waited a week and I didn't hear from Mr. Lachmund and I went back to see him again, and he said, 'I saw Mr. McNary and he is willing to settle this, but I haven't seen Mrs. Carson or Mrs. Pincus, but I will see them in a few days and let you know.' So I went back again and at that time Mr. Muellhaupt went with me and Mr. Lachmund said, "You go and see John Carson, I have left the matter with him.' So I went to see Mr. Carson and he asked us what we would take for a settlement—"

At this point the defendants moved for a mistrial, and further moved that in the event their motion was denied all of the above-quoted testimony be stricken. They contended that this testimony indicated efforts at compromise. After argument by counsel, the trial judge, in ruling, called the jury's attention to this testimony, and, after stating that a motion had been made to strike it from the record, instructed the jury:

"That motion is allowed, and I now advise you that you must not under any consideration whatever allow the testimony concerning the alleged conversations with

Mr. Lachmund, in any shape, manner or form, to influence you in your decision in this case in any way, either for plaintiff or defendants. You must totally disregard that and keep this clear in your minds.''

The assignment of error predicated upon this ruling is expressed in appellants' brief in the following words: ''The court erred in failing to declare a mistrial upon the respondent's interjection of testimony relating to a conversation had in an attempt to reach a compromise between the parties.''

Webster's New International Dictionary (2d Ed.) gives as a definition of the word ''compromise'' the following: ''A settlement by arbitration or by consent reached by mutual concessions; a reciprocal abatement of extreme demands or rights, resulting in an agreement; composition.'' Ballentine's Law Dictionary defines ''compromise'' thus:

''An agreement or arrangement by which, in consideration of mutual concessions, a controversy, either in court or out of court, has been terminated.'' Webster's New International Dictionary (2d Ed.) gives as one of the definitions of the word ''settle'' the following: ''To close by payment, as accounts, to liquidate;'' and as another: ''To adjust differences or accounts; to come to an agreement; compound; as 'He has settled with his creditors.' '' An admission against interest is, of course, an acknowledgment, express or implied, by a party of the existence of the facts to which he adverts.

■ As is seen from the definitions of the word ''compromise,'' one of its elements is a concession. The concession is prompted by a desire for peace and an avoidance of litigation. Influenced by such promptings, the party may forego rights which he could readily establish in litigation, but he surrenders them for the

sake of peace. Thus, since an offer of compromise may involve the surrender or waiver of rights rather than an insistence upon them, it is unlikely to be a reliable source of admissions. Due to this circumstance, as well as to a desire to encourage compromises, the law regards offers of compromise as privileged communications, and renders them inadmissible: *Wallace v. American Life Insurance Co.,* 111 Or. 510 (225 P. 192, 227 P. 465).

Section 7-202, Oregon Code 1930, provides:

"An offer of compromise is not an admission that anything is due; but admissions of particular facts, made in negotiation for compromise, may be proved, unless otherwise specially agreed at the time."

■■ Let us revert to the challenged testimony for the purpose of ascertaining whether Lachmund was making an offer of compromise. The plaintiff quoted him as stating, "We do not dispute your amount." This certainly was an admission by Lachmund that the sum claimed by the plaintiff was fair. It was an admission against interest, but not a compromise offer. Next, he quoted Lachmund as saying, "We feel obligated toward you." This was an admission by Lachmund that the fire of August 17 created a liability in favor of the plaintiff. Possibly, Lachmund meant a moral but not a legal obligation. In any event, the quoted words contain no indication that either of the parties was compromising anything. Upon his next visit to Lachmund's office Lachmund told him, so the plaintiff swore, "I saw Mr. McNary and he is willing to settle this". That statement certainly did not bind the defendant McNary, nor was it an admission of anything by Lachmund. The word "settle" appears in the statement, but, as we have seen, that word may mean pay, or imply resort

to the process of adjustment whereby debtor and creditor determine the balance owing. We add that at that time the plaintiff was indebted to the defendants in an undetermined amount on account of dryer service. It is true that settle may also mean compound. But the quoted testimony does not indicate that the parties had reached the stage of planning a compromise. Upon his next visit Lachmund directed the plaintiff to call upon his (Lachmund's) attorney. At the latter's office the plaintiff was asked "what we would take for a settlement". That might have been an inquiry for the sum the plaintiff would accept by way of compromise, or it might have been an inquiry as to his minimum demand. But, in either event, it was an inquiry only, not a statement. It was not a disclosure of attitude by the attorney, unless the inquiry carried with it an implication that the attorney was willing to accept an offer which involved compromises on both sides. Certainly, it was not an express offer by the attorney to compromise. The above is an analysis of the entire statement—there is nothing more, unless we should deem that the entire incident revealed in Lachmund's mind a disposition favorable to compromise. Be this as it may, it is capable of a construction that Lachmund felt that the fire created in the plaintiff's favor a liability for the amount of the destroyed prunes. However, if this testimony is capable of two constructions—one showing an attitude favorable to a compromise, and the other indicating a willingness to pay, that fact would not destroy its admissibility for the latter purpose. Evidence that is capable of serving two or more purposes, only one of which is permissible, is not rejected. It is received for the lawful purpose, and the court, by direction to the jury, limits its application to that purpose only.

A word which sometimes means the same as admission is the word "concession". The latter at times includes the former. But concessions as they take place in effecting compromises are induced by a desire to avoid litigation—not by a mere desire to be frank. They involve the surrender of rights as distinguished from merely stating facts. Admissions may be made when no thought is entertained of entering into compromises. There is nothing before us that indicates that Lachmund's admissions were any part of compromise negotiations. Possibly, had the witness continued with his narrative it would have developed that a compromise was under way, but the part which he gave before being stopped is not reasonably susceptible to an interpretation that a compromise was under way. Plaintiff's counsel, while seeking to convince the trial judge that the evidence was admissible, stated: "It is not the intention of counsel for plaintiff to inject into this any offers of compromise. * * * It is our contention, if the Court please, that this was not a part of a conversation in which an attempt to compromise a claim was made." Defendants, in seeking to support their position, made no assertion that a compromise was under way, unless the above testimony itself so indicated.

■ We have given this challenged testimony very careful consideration because the defendants stress the importance of this assignment of error, and argue it with spirit. It is, however, our belief that the challenged testimony indicates nothing more than two admissions against interest made by Lachmund and admissible only against him. In our opinion, it does not indicate any offer of compromise: *McCallister v. Farra*, 117 Or. 278 (243 P. 785); *Cochran v. Baker*, 34 Or. 555 (52 P. 520, 56 P. 641); *Bennett v. Northern Pacific Express*

*Co.,* 12 Or. 49 (6 P. 160). It appears to us that the defendants were not injured by the ruling made by the court. Quite to the contrary, testimony admissible against Lachmund was stricken out.

The second assignment of error is based upon a ruling which denied the defendants' motion for a directed verdict. The complaint charged the defendants with negligence in the following particulars: (a) construction of the ceiling of the heat chambers with wood which was unsuitable for that purpose; (b) using a defective stove in heat chamber No. 2; (c) permitting splinters, chips, and other inflammable material to fall into heat chamber No. 2 in close proximity to the defective stove; (d) using defective bearings for the fan shaft which permitted oil intended for them to escape to the nearby timbers; and (e) failing to supply sufficient fire-fighting equipment for the dryer.

Evidence indicates that during the evening of August 16 a fire broke out in the throat of heat chamber No. 2 at the place where tunnel No. 6 begins. In extinguishing the blaze, the defendants' employees chopped some of the woodwork in the mouth of the heat chamber with an ax, thereby causing splinters, chips, etc., to drop into the heat chamber near the stove. The chopping loosened the sheet metal and asbestos covering over the wooden ceiling of the heat chamber and exposed some of the timbers. The blaze was extinguished. R. W. Fiscus, the employee of the defendants who fired the stoves at night, testified: "I had trouble with that stove that night and every night. * * * Well, I couldn't hold the temperature down. It would go up with a small fire. If you kept any fire at all the temperature would go way up." He was referring to the stove in heat chamber No. 2. He swore that he

called the matter to the attention of defendants' foreman, Wiley Weathers. Further, referring to this stove, he swore: "There was more or less sparks came from the back part of the stove. Whether it came from the pipe or stove or what, I couldn't tell you." Mr. Weathers, while testifying for the defendants, was asked by the trial judge: "Is it necessary to have the heat chambers fireproof?" and replied, "Yes, sir." He claimed that the wooden ceiling of the heat chamber, covered as it was with asbestos and sheet metal, was fireproof. Virtually all evidence offered by the plaintiff to show the manner in which other dryers were constructed, especially the top of their heat chambers, was excluded upon objections by the defendants. However, Weathers, after testifying on direct examination concerning his experience in the construction of prune dryers, on cross-examination described two dryers built by himself in each of which the ceiling of the heat chamber was a concrete slab. Upon re-direct examination, he was asked and answered as follows:

"Q. Is there any standard among dryers throughout the Willamette Valley? A. No, there is not."

Fiscus claimed that the bearings of the fan shaft contained no oil cups and that, therefore, when the bearings were oiled, which was done once every two hours, oil inevitably dropped from the can and bearings to the adjacent timbers. Since the latter were near the mouth of the heat chamber out of which air at a high temperature was being blown by the fans, the plaintiff claims that the oil rendered the timbers peculiarly inflammable.

On the evening of August 17 the destructive fire occurred. According to Fiscus, it started between tun-

nels 5 and 6; in other words, at the same place where the fire had occurred the previous night. This witness swore that when the alarm was given and he looked down into heat chamber No. 2, being the place where the chips and refuse had dropped the night before, he could see flames. The defendants' witnesses swore that the fire of August 16 occurred in tunnel No. 9, and that the fire of August 17 broke out under tunnel No. 3. However, as indicated by the foregoing, the plaintiff's claim that the fire which destroyed the dryer broke out at the same place as the night before is supported by substantial evidence. If Fiscus's testimony is truthful, then the fire that caused the plaintiff's loss broke out in a spot from which the asbestos and sheet metal covering had been partially torn away, and which was directly over a defective, spark-emitting stove, which, in turn, was surrounded by charred chips and splinters. Weathers, who swore that he was present at the beginning of the fire, said that the cause was unknown to him, but added, "My opinion is it was caused by spontaneous combustion from overheated wood". In view of the evidence, we cannot say that the charges of negligent operation are not supported by substantial proof.

It will be recalled that the complaint charges that the defendants' fire-fighting equipment was inadequate. The plaintiff referring to Weathers, swore that a few hours prior to the fire, "I asked him whether or not they had any fire protection, and he said, 'No, we have not.' " He added, "They have had frequent fires in there prior to this fatal fire." An hour after obtaining this information he sent a truck to remove his dried prunes from the building, but the truck broke down on defendants' premises and the fire occurred

before the prunes could be transferred. Weathers testified, "When you are drying prunes, you are drying wood, too". His brother, who had had extensive experience with prune dryers, testified, "Some have fire extinguishers of different natures, some only have a little one and others have a number, and I have been places I don't believe they had any". Fiscus said that he and defendants' other employees who attempted to extinguish the blaze of August 17 used a five-gallon milk can, a lunch bucket and a tin cup. He claimed no other equipment was available. Defendants' witnesses agreed that these were the implements that actually were used, but claimed they were suitable and that other equipment was available. Two hundred feet from the dryer, standing twenty feet above the ground, was a 1,000-gallon tank which supplied the dryer with water. According to Weathers, a 1¼-inch pipe carried water from this tank to the near side of the dryer. A ¾-inch pipe led from this to the tunnel level of the dryer where it terminated in a faucet. From the latter the fire fighters filled their milk can. The 1¼-inch pipe ran under the building and terminated in a faucet at the lower level, but was inaccessible to those who were attempting to extinguish the blaze. Weathers swore that there was also available two pieces of hose, one 12 or 15 feet long, and the other 50 or 60 feet, two barrels of water on opposite sides of the structure, at least one fire bucket and a large number of ordinary pails. The plaintiff's witnesses denied that the hose, pails and buckets were present. Lonnie Cannoy, defendants' dryer on the night shift, who helped to fight this fire, testified that in their efforts to extinguish the fire a hole was chopped in the floor of the tunnel, and that the drinking cup previously mentioned was used in throw-

ing water under the joists to the place where the blaze was seen. He was then asked and answered as follows:

"Q. Could you have reached that fire with a hose? A. Well, if we had hose enough we could have reached it.

"Q. Did you make any attempt to reach it with a hose? A. No.

"Q. Did you have hose enough to reach from the hydrant to this place? A. I don't know whether there was hose enough or not. I am sure there weren't from the front where they washed the prunes."

Glen Strausbaugh, another of the defendants' employees, who attempted to extinguish the fire, testified as follows:

"Q. You didn't use any hose? A. There wasn't a hose there long enough.

"Q. The hose would not reach from the hydrant? A. I don't believe so."

The evidence is not entirely clear, but it seems to indicate that after a hole had been chopped in the floor and some water had been thrown on the fire with the tin cup, it was believed that the fire had been extinguished. Defendants' foreman and four others of the group of six employees then walked away. Shortly one of the men who remained called out that smoke was again issuing forth. The men returned and again chopped with the ax. When a hole was made in the floor directly over the fire, flames bust forth with such fury that the man who was wielding the ax was badly burned. All were compelled to flee to save their lives.

We believe that the above is a fair review of the evidence favorable to the plaintiff. It indicates, according to our belief, that a defective stove, surrounded with chips, splinters and other small pieces of well-dried material, may have been the cause of the fire.

Directly over the stove were boards which the night before had been partially exposed. They were in the direct path of sparks and flames coming from the fire below. If we are justified in believing that the refuse finally burst into flames. Then, too, in the immediate vicinity of the danger were timbers splattered with oil. In other words, plaintiff's testimony is capable of accounting for the start of the fire, if accepted as truthful by the jury. We have no right to delete it from the record. Next, the plaintiff's evidence above reviewed, if truthful, shows that the fire-fighting equipment was not only meager, but also proved to be insufficient. As the defendants' foreman testified, the heat of the dryer not only dried the prunes, but also dried the wooden material constituting the dryer. Underneath it were the six large stoves capable, as all stoves are, of starting unwelcome fires. One of them emitted sparks and overheated. Above the stoves were twenty-three partitions, only four feet apart, made of light material which, together with the two outside walls, formed the twenty-four tunnels. Hot blasts twenty-four hours each day thoroughly dried these walls. Thus, we have a structure in which one could readily foresee fires were bound to break out from time to time; and the uncontradicted testimony shows that fires frequently occurred. Likewise one could readily foresee that even a small blaze would make rapid headway in this tinder box equipped with twenty-four power driven fans which were creating strong drafts.

■ The evidence reviewed above indicates that the relationship between the plaintiff and the defendants was that of bailor and bailee for hire. The relationship was undertaken for the mutual benefit of the parties. The contract which created it required the defendants, as operators of the dryer, to perform work upon the

subject matter of the bailment by converting the bailed items into dried prunes. There is no contention that the terms of the agreement were special or were otherwise than as fixed by the law of bailments. The law is well settled that under these circumstances it was the defendants' duty to use ordinary care and diligence in safeguarding the plaintiff's property against destruction: *Simms v. Sullivan,* 100 Or. 487 (198 P. 240, 15 A. L. R. 678). From 6 Am. Jur., Bailments, p. 335, § 248, we quote:

"The bailee must proportion his care to the injury or loss which is likely to be sustained by any improvidence on his part. His duty of reasonable or ordinary care in keeping and returning the thing bailed to the bailor has been held to include, in case the property is stolen, the duty to exercise reasonable diligence in attempting to recover it, and in case it is menaced by fire, flood, or other disaster, though through no fault of his, he is bound to make every reasonable effort to save it; if damage or loss occurs by reason of his failure in this respect, he is liable to the bailor thereof."

In *Barron v. Eldredge,* 100 Mass. 455 (1 Am. Rep. 126), the court was speaking of a warehouseman's duty, it is true, but nevertheless the principles which it enunciated, we believe, are applicable to this case. From the decision, we quote:

"They cannot be charged for the loss, if in the custody of the property they exercised ordinary care. What constitutes such care is a question of fact to be judged of with reference to all the circumstances of the case. The nature and value of the property, its exposure to damage or loss, its proximity to danger from fire, the means employed to prevent or arrest the progress of fire, the location, character, and construction of the storehouse in which it was placed, are elements to be considered. The question of ordinary care is to be settled also in reference to the degree of care which other

persons, engaged in similar business, are in the habit of bestowing on property similarly situated. And generally the care and vigilance required is that which men of ordinary prudence in the same business usually bestow on property placed in their custody, and similarly situated in its exposure to loss. What constitutes negligence in these cases is a question peculiarly proper for the determination of the jury."

From *Runkle v. Southern Pacific Milling Co.*, 184 Cal. 714 (195 P. 398, 16 A. L. R. 275) (annotated), we quote:

"It is idle to discuss upon appeal to this court the weight of the evidence upon which the judgment rests, and, of course, it is only when the facts of a given case are not in any event or in any view of the case susceptible to the inference of negligence sought to be deduced therefrom that the question of negligence becomes one of law for the sole consideration of the court rather than one of fact for the determination of the jury. It is conceded, as indeed it must be, that by reason of the relationship of the parties arising out of the contract of bailment for hire and the provisions of section 21 of the Warehouse Receipts Act (Stats. 1909, p. 437), that the duty devolved upon the defendant to exercise such care in the safeguarding of the plaintiff's property as a reasonably careful owner of similar goods would exercise, and, failing in this, the defendant must be held in damages for the resultant loss. The evidence in the instant case shows, in response to the issue of negligence, substantially as follows: The defendant's warehouse was a wooden structure, two hundred feet long and 74 feet wide, in which, in addition to general merchandise, gasoline and other inflammable and explosive substances were stored. Two barrels of water, without buckets at hand, were located at either end of the building, and these, with two small pyrene fire-extinguishers and a three-quarter inch low-pressure water pipe leading from a neighbor's well and terminating with a faucet in a sink inside the warehouse, constituted the

fire-fighting appliances provided by the defendant for the protection and preservation of the warehouse and its contents. Whether these fire-fighting appliances were ordinarily adequate and reasonably sufficient as a protection against loss and damage by fire under all of the circumstances, and considering particularly the situation of the warehouse, was clearly a question of fact for the jury to determine.''

From *Belt R. & Stockyard Co. v. McClain,* 58 Ind. App. 171 (106 N. E. 742), we quote:

''The relation of bailor and bailee being shown, the law imposed upon the defendant the duty to use care for the safety of the property intrusted to his care. This duty required the defendant to foresee every danger to such property which a person of ordinary prudence would have foreseen under the circumstances, and to use such care to guard against such dangers as a person of ordinary care, under the circumstances, would have used. If a loss by fire was such a danger to the property as should have been foreseen by a person of ordinary prudence, then it was the duty of defendant to exercise such precautions to prevent a fire as ordinary care required, and to make such provisions for the care of property and for its rescue and preservation in case of fire as ordinary prudence would dictate.  *  *  *

''It is further asserted that the complaint shows on its face that the loss of the property was not caused directly and proximately by the negligence of appellant as charged in the complaint; but, on the contrary, that it was caused directly by a fire which occurred without any fault of appellant, and that this fire was an independent cause which intervened between the negligence charged and the injury, thus relieving appellant from responsibility. From what has been said it must appear that this position is untenable. If the danger of a loss by fire was one which should have been foreseen by a person of ordinary prudence, acting under the same conditions and circumstances, then ordinary care required that appellant should have foreseen such danger

and should have taken such precautions for the safety of the property in case of fire as ordinary prudence would dictate.''

From the above we believe it is clear that it was the defendants' duty to furnish a building reasonably fit and safe for the purposes of the bailment. Certainly, it was not their duty to furnish a fireproof building, and, since the drying season lasts for only about one month, installation of expensive fire extinguishing systems would very likely be deemed unnecessary; but by offering testimony that the place was equipped with two barrels, fire buckets and lines of hose, the defendants indicated that that amount of protection, at least was required.

The principle of law that is applicable is apparently free from dispute for the defendants have offered no criticism of the instructions of the trial judge which stated to the jury the equivalent of the above. But they argue that the evidence has not disclosed the cause of the fire, and that it proves that the defendants furnished an adequate amount of fire-fighting equipment. The rule under consideration which imposed upon the defendants the duty of employing ordinary care in safeguarding the bailed property, and therefore of furnishing a building reasonably fit and safe, is indefinite. We know of no decisions which applied themselves to circumstances similar to those before us, and there is no evidence showing the custom among prune dryer men in regard to safeguarding the property intrusted to them. From Restatement of the Law, Torts—Negligence, page 748, we quote:

''If there is no legislative enactment covering the circumstances of a particular case and there is no decision of an appellate court which establishes whether particular conduct is or is not negligent, a trial judge

may withdraw a case from a jury whenever the jury acts unreasonably in finding the defendant negligent. In both cases, this is substantially an expression of the trial judge's conclusion that the jury would be or was acting with unreasonable severity in so applying the standard of reasonable care as to hold the defendant's conduct to be negligent. While such rulings, unless an appeal is taken from them, are conclusive in the particular case, they do not either establish or define a standard, since they are, at most, persuasive and not binding upon any other court.

"If no standard of obligatory conduct has been established by a legislative enactment and there is no ruling of an appellate court upon substantially identical situations and the trial court has not withdrawn the case from the jury, the jury must itself define the standard of the reasonable man with such particularity as is necessary to make it applicable to the facts of the case before it."

■ Defendants' motion for a directed verdict was a request for the withdrawal of the case from the jury upon the theory that it would be unreasonable to require dryers to remove litter from around their stoves, to use stoves that do not emit sparks and fire, and to furnish hose of adequate length or buckets. The jury evidently believed that one, if not all, of these precautions were reasonable. They found that the defendants were negligent in permitting the fire to start, or in not extinguishing it, or both. We cannot say that the standard which the jury embraced was unreasonable, and , hence, it follows that this assignment of error reveals no merit.

The judgment of the circuit court is affirmed.

BEAN, C. J., and RAND and KELLY, JJ., concur.